CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
September 29, 2025
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JOEL ALLEN BURRELL,<br>    Plaintiff,<br><br>v.<br><br>RN A. HAWKS, *et al.*,<br>    Defendants. | Civil Action No. 7:24-cv-00081<br><br>By: Elizabeth K. Dillon<br>Chief United States District Judge |

## MEMORANDUM OPINION

*Pro se* plaintiff Joel Allen Burrell, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983 against many defendants alleging retaliation in violation of the First Amendment and deliberate indifference to his serious medical needs in violation of the Eighth Amendment. (Compl., Dkt. No. 1.) Six of those defendants have moved to dismiss and for summary judgment—five nurses (Amber Hawks, Barbara Plaisance, Amanda Taylor, Anna Reavis, Molly Reavis) and a doctor (Tracy Mathena) (collectively the Medical Defendants). (Dkt. Nos. 39, 54.)[1] Plaintiff filed a response in opposition to the motion to dismiss. (Dkt. No. 51.) Burrell did not respond to the summary judgment motion.

For the reasons stated below, defendants' motions will be granted.

### I.  BACKGROUND

**A. Burrell's Complaint**[2]

Burrell alleges claims arising from his incarceration at River North Correctional Center (RNCC). Burrell, as noted, has sued six medical defendants who have brought a motion to dismiss and a motion for summary judgment. Other defendants are Nurse M. Morton,

---

[1] The court also notes that these defendants filed an answer. (Dkt. No. 41.) Burrell filed a "response" to the answer. (Dkt. No. 46.)

[2] Plaintiff's complaint is not sworn under penalty of perjury. (Dkt. No. 1.)

Ombudsman R. Perry, Regional Ombudsman K. Paderick, Unit Manager H. Colna, Unit Manager Montgomery, Correctional Officer N. Sherwood, and Sgt. Jones.[3]  Plaintiff has filed several pages of attachments along with his complaint, which include grievances, grievance receipts, facility requests, and medical records.  (Dkt. No. 1-1.)

On October 8, 2023, plaintiff submitted an emergency grievance related to his placement in a top bunk after being given a bottom bunk pass for medical reasons.  (Compl. at 13–14.)  Burrell's symptoms were severe migraine, fever, night sweats, coughing, and chest pains at a level 10, as noted by Nurse Plaisance.  She did not conduct any medical evaluation that is reflected in her response to Burrell's emergency grievance.  (*Id.* at 14.)  Nurse M. Reavis received another emergency grievance regarding severe chest pains, shortness of breath, gasping for air, and coughing up blood, on September 28, 2023, but she did not pursue any medical evaluations.  (*Id.* at 14.)

Plaintiff had an x-ray on his neck on January 16, 2024.  Burrell had placed a facility request to sick call describing symptoms such as blindness, difficulty breathing, blockage in airway passage, esophagus tightening, burning in eyes, heart, and lungs.  He requested a full body x-ray and a toxicologist.  N. Sherwood prevented Burrell from seeking medical assistance, pepper sprayed Burrell, causing partial blindness, and used excessive force in retaliation for seeking medical attention and filing a civil lawsuit.  (*Id.* at 13.)  A response by Nurse Hawks on January 12, 2024, stated that plaintiff would be placed on the sick call list.

Burrell alleges that he received a pass for assessment for a medical emergency on January 24, 2024. (Compl. 11.)  Burrell was experiencing shortness of breath, difficulty swallowing, itching and burning within his organs, vomiting, tightening trachea, vision loss, and hearing loss.

---

[3] These defendants have filed an answer to the complaint.  (Dkt. No. 36.)

Plaintiff was evaluated by Dr. Mathena. Burrell complains that Dr. Mathena did not conduct any testing or make any outside orders. (*Id.* at 12.) Plaintiff thought he had swallowed a capsule of medication that included parasites, insects, or poison. He was told that Dr. Mathena would order labs and stool softener. Burrell's skull was swollen to a level 10 pain.

In the waiting area, Nurse Taylor asked plaintiff if he was alright, but the symptoms still persisted. She took her lunch break, and Burrell's "current medical condition was non-existent to her at that moment." (*Id.*)

On January 26, 2024, at 4:45 a.m., Burrell's medical condition, syncope, caused him to faint and fall down the stairs. (*Id.* at 18.) Plaintiff did not see a doctor and was not transported to an outside medical facility. Nurses Anna and Molly Reavis were the charge nurses at that time, but no diagnostic testing was performed. Nurse Taylor was also deliberately indifferent because she was told that Burrell fainted and also did not order any testing.

Burrell alleges that Dr. Mathena committed deliberate indifference, on January 24, 2024, when he did not refer plaintiff for testing or an outside specialist for cat scan or toxicology. Burrell's symptoms were shortness of breath, difficulty swallowing, brain, heart, lungs, skin itching and burning, vomiting, lymph swollen, trachea closure, and vision loss. (*Id.* at 18–19.) Nurse Taylor was deliberately indifferent when asking Burrell if he was "okay," and Burrell responded no, but she proceeded with her lunch break. (*Id.* at 19.)

Nurse Molly Reavis was deliberately indifferent in her response to an emergency grievance on January 26, 2024, where no medical assessment was provided. (*Id.*) Nurse Amber Hawks committed deliberate indifference in her response to a facility request and written complaint on January 12, 2024. Burrell alleges that Nurse Hawks placed him on sick call for January 19. (*Id.* at 20–21.)

3

Nurse Molly Reavis was also deliberately indifferent when she did not conduct a medical evaluation of plaintiff on September 29, 2023. (*Id.* at 22.)

Finally, Burrell has alleged that Nurse Plaisance was deliberately indifferent to him by not examining him or checking his vitals after a syncopal episode on October 8, 2023. (Compl. 20.)

Burrell requests a transfer to a different facility, transfer to an emergency room for evaluation, $2.5 million in compensatory damages against each defendant in their individual and official capacities, and $350,000 in punitive damages against each defendant in their individual and official capacities. (*Id.* at 11.)

**B. Facts in Support of Defendants' Motion for Summary Judgment**

In support of their motion for summary judgment, defendants filed Burrell's RNCC medical records. (Ex. A, Dkt. No. 55-1.) Defendants also provided affidavits from Dr. Mathena, Nurse Taylor, Nurse Anna Reavis, and Nurse Molly Reavis. (Ex. B, C, D, E; Dkt. Nos. 55-2, 55-3, 55-4, 55-5.)

Burrell was incarcerated at RNCC in May 2023. His medical history includes anxiety, paranoid behavior, presumed psychosomatic disorder, and syncope. Psychosomatic disorder is a psychological condition involving physical symptoms that lack medical origin or explanation. Syncope means fainting or passing out, which happens when there is a sudden, temporary drop in the amount of blood flow to the brain. Most of the time, it is harmless and short-lived. (Ex. B, ¶ 4; Ex. C, ¶ 4.)

Plaintiff's first syncopal episode at the prison occurred on May 22, 2023. (Ex. A at 234–35.) Burrell reported to nursing that he experienced chest pain for an hour and when he stood up to use the toilet, he lost consciousness. Nursing contacted Dr. Mathena by phone to report the

4

situation, and Dr. Mathena ordered that Burrell be transferred to Twin County Regional Hospital for further evaluation. At the hospital, Burrell was alert, oriented, calm, and in no distress. (*Id.* at 133–38.) He was monitored and returned to the prison "asymptomatic and stable" with a diagnosis of chest pain and syncope. (*Id.*)

Another syncopal episode happened on May 27, 2023, around 1:00 p.m., when Burrell was found unconscious in his cell. (Ex. A at 231.) Nursing evaluated him and transferred him to the medical unit. His vital signs were stable, and he regained consciousness spontaneously. Burrell was alert and oriented and complaining of chest pain. An EKG was performed, and the results were normal. Dr. Mathena ordered that Burrell be monitored in the medical observation unit (MOU). Over several days in MOU, Burrell often declined vital signs, and nurses documented him as being alert, oriented, and calm. (*Id.* at 228–30.)

Burrell suffered another collapse in the pod on June 21, 2023. (*Id.* at 226.) Following the episode, he reported he had experienced chest pain and shortness of breath before collapsing. Another EKG showed normal results. After being notified by nursing, Dr. Mathena ordered that Burrell be transferred to the hospital for further evaluation. (*Id.* at 105.) Diagnostic blood work, an EKG, and a CT scan of Burrell's head were all normal. (*Id.* at 109–121.) Burrell was discharged back to the prison with a diagnosis of syncope. (*Id.* at 107-09.)

Dr. Mathena evaluated Burrell on June 22, 2023. Burrell complained about back and shoulder pain from the fall during the syncopal episode, but relayed he felt much better. (*Id.* at 225.) He had no chest pain or dizziness, and he denied nausea, vomiting, and diarrhea. (*Id.*) His vital signs were normal, and he was not in distress. Dr. Mathena ordered a stress test and x-rays of the spine, which were normal. (*Id.*)

5

On August 2, 2023, Burrell was found unresponsive. (*Id.* at 211.) Nurse Anna Reavis responded to his cell and administered Narcan for narcotics overdose. Burrell became responsive after three minutes. (Ex. D, ¶ 7.) Plaintiff had a regular heart rate and even aspirations. He denied illicit drug use. Nurse Reavis called Dr. Mathena, who ordered Burrell to be transferred to the hospital for further evaluation. (*Id.*) Plaintiff was diagnosed with syncope at the hospital. (*Id.* at 89–95.)

After returning to the prison, Dr. Mathena ordered a stress test, which was administered at the hospital on August 16, 2023. (*Id.* at 46.) The results were normal. (*Id.* at 204.) Dr. Mathena ordered a cardiac Holter monitor on September 28, 2023, based upon Burrell's complaints about palpitations. (*Id.* at 201–02.) An echocardiogram also showed normal results. (*Id.*)

Dr. Mathena evaluated Burrell again on October 18, 2023. (Ex. A at 199.) Burrell complained about chest pain for two hours. He denied shortness of breath, nausea, vomiting, and diaphoresis. Burrell's vital signs were stable, and the physical examination showed no abnormal findings. Dr. Mathena was awaiting results from the cardiac Holter monitor, and he was considering a referral to cardiology if needed. (*Id.*)

Nurse Taylor treated Burrell for the first time on October 24, 2023, replacing the tape on his cardiac monitor. (Ex. C, ¶ 11.) At the time, plaintiff was alert and oriented. (*Id.*)

Burrell was seen by Dr. Mathena on October 27, 2023. (Ex. A at 194.) Burrell continued complaining about daily chest pain with no shortness of breath. Plaintiff had stable vital signs and was not in distress. His cardiac Holter monitor was removed, and the results were pending. Dr. Mathena noted that Burrell's repeat stress test was negative. Dr. Mathena ordered that plaintiff continue taking aspirin and be assigned to a bottom bunk. (*Id.*)

On November 10, 2023, the cardiac monitor results showed two brief episodes of supraventricular tachycardia (fast heart rate). Plaintiff was scheduled for an appointment with an outside cardiologist on December 29, 2023. (*Id.* at 194.)

On December 27, 2023, Burrell was evaluated by Dr. Mathena, who noted no change in diagnoses. (*Id.* at 191.) The stress test results were normal. The Holter monitor was observed as showing brief episodes of supraventricular tachycardia. Dr. Mathena explained Burrell's reference to cardiology. (*Id.*)

Burrell was found nonresponsive in his cell the next day, on December 28. (*Id.* at 188–90.) Nursing evaluated him and noted normal breathing and pulse with no seizure activity. An EKG was performed, and it was normal. Burrell regained consciousness and told staff that he had not eaten much during the day. He also acknowledged that he did not always take his "keep on person" medications. Nursing notified Dr. Mathena, who ordered Pepcid for heartburn and continued monitoring. (*Id.*)

On December 29, 2023, Burrell saw an offsite cardiologist. (*Id.* at 51.) When he returned, a nurse practitioner reviewed the records from the cardiologist and placed an order for weekly blood pressure checks. Dr. Mathena approved this order and ordered an echocardiogram. (*Id.* at 186–87.)

Burrell presented to the medical unit on January 2, 2024, complaining of chest pain, tightness, shortness of breath, and epigastric pain. (*Id.* at 186.) Nurse Taylor saw Burrell for a sick visit. The results of an EKG were normal, and plaintiff's vital signs were stable. (Ex. C, ¶ 16.) After being notified by Ms. Taylor, Dr. Mathena ordered aspirin and Maalox and directed that Burrell be placed in MOU for observation. (*Id.*) An echocardiogram on January 10 was normal. (Ex. A at 5, 185.)

On January 12, 2024, Burrell complained of shortness of breath, nausea, and vomiting while eating. He stated that he felt like he was being poisoned. Dr. Mathena ordered an x-ray of plaintiff's neck, which was normal. (*Id.* at 181–84.)

Burrell then was seen on January 24 complaining about a "variety of problems" to Dr. Mathena. (*Id.* at 180.) Burrell stated that he had difficulty swallowing and digesting food. He thought he had a parasite and chemicals in his head, and he felt like things were "moving" under his skin. After a physical examination, Burrell was in no distress, his lungs were clear, and his abdomen was soft and non-tender. His vital signs were stable. However, he exhibited disorganized, paranoid thinking. Dr. Mathena documented that he expressed multiple somatic complaints and that his paranoia had been getting worse of the prior few months. Dr. Mathena referred Burrell to mental health. (*Id.*)

Early in the morning of January 26, 2024, Burrell experienced another syncopal episode. (*Id.* at 179; Ex. E, ¶ 6.) Plaintiff reported that he hit his head during the fall. Nurse Molly Reavis[4] took plaintiff's vital signs, which were normal, and performed an assessment. Burrell had no visible injuries, but Nurse Reavis recommended transfer to the hospital for further evaluation. Review of the surveillance video by RNCC staff confirmed that Burrell did not hit his head in the fall. (*Id.*)

Molly Reavis notified Ms. Taylor about the episode. Nurse Taylor was already aware of Burrell's history of chronic syncope. (Ex. C, ¶ 25.) She knew that all EKGs and diagnostic tests ordered by Dr. Mathena had produced normal results. Thus, Taylor determined that because Burrell had no injuries, his vital signs were stable, and he was not complaining of ongoing symptoms such as chest pain or shortness of breath, he could be monitored in MOU and did not

---

[4] Nurse Anna Reavis does not recall seeing or treating Burrell on January 26, 2024. (Ex. D, ¶ 5.) Her name is not referenced in the medical records. (Ex. A at 179.)

8

need to be transferred to the hospital. (*Id.*, ¶ 21.) Also, nurses are not authorized to order tests or prescribe medications. (Ex. D, ¶ 11.) Accordingly, Ms. Taylor instructed Molly Reavis to notify Dr. Mathena about the situation so Dr. Mathena could order tests or medications as necessary. (Ex. A at 179.) Molly Reavis then notified Dr. Mathena. (Ex. E, ¶ 7.)

The following day—January 27—Burrell saw Anna Reavis complaining about "brain parasites." (Ex. A at 178.) He was in no distress, he verbalized no suicidal or homicidal ideation, and his vital signs were stable. (*Id.*) Nurse Reavis requested a psychiatric evaluation. Reavis did not consider Burrell's presentation as requiring a referral for diagnostic testing. (Ex. D, ¶ 11.) Anna Reavis did not see Burrell again after January 27, 2024. (*Id.*, ¶ 9.)

Dr. Mathena evaluated Burrell on February 5, 2024. (Ex. A at 173.) Burrell voiced multiple complaints, including smelling chemicals in his food, double vision, chest pain leading to syncopal episodes, hearing loss when lying on one side, and a crawling sensation in his head. (*Id.*) These complaints did not make sense from a clinical perspective. (Ex. B, ¶ 27.) Psychiatry had evaluated him the previous week and order Risperdal, an antipsychotic, which he had not started. (Ex. A at 173.) Upon examination, Burrell appeared paranoid, but was alert and oriented and in no distress, and his vital signs were stable. Dr. Mathena ordered bloodwork to include parasite testing, and Dr. Mathena also ordered a referral to onsite optometry. (*Id.*) Burrell's presentation on February 5 did not merit a CT scan or toxicologist. (Ex. B, ¶ 27.) Bloodwork performed on February 7 showed normal results. (Ex. A at 68, 171.)

Dr. Mathena saw Burrell in MOU for follow up on February 14, 2024. (Ex. A at 166.) He still complained about something "crawling around in my head," eye irritation, and double vision. Burrell declined vital signs but was in no distress. He stated his syncope had resolved. Dr. Mathena ordered his return to general population. Over the next several weeks, Burrell was

9

evaluated several times by nurses and nurse practitioners, but this was the last time he was seen by Dr. Mathena.  (Ex. A at 48–165; Ex. B, ¶ 25.)

Burrell was transferred to Keen Mountain Correctional Center on April 2, 2024.  (Ex. A at 156.)

## II.  ANALYSIS

**A.  Motion to Dismiss**

The Medical Defendants move to dismiss Burrell's damages claims against them for actions taken in their official capacities.  Defendants argue that the court lacks subject matter jurisdiction over these claims because they are entitled to sovereign immunity.  *See* Fed. R. Civ. P. 12(b)(1) (allowing a motion to dismiss based on lack of subject matter jurisdiction); *Nansemond Indian Nation v. Commonwealth of Va.*, CIVIL NO. 2:25-cv-195, 2025 WL 2300175, at *1 (E.D. Va. Aug. 8, 2025) (explaining that Rule 12(b)(1) is the correct vehicle for dismissal based on sovereign immunity because if it applies, the court is "deprived of subject matter jurisdiction") (citing *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018)).  The court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the motion to one for summary judgment." *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004).  The plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction.  *Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015).

The Medical Defendants are employees of the Virginia Department of Corrections, and thus, are employees of the Commonwealth of Virginia.  (*See, e.g.*, Dkt Nos. 55-2, 55-3, 55-4, 55-5.)  Burrell's claims for damages against them in their official capacities are barred by sovereign immunity.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Kentucky v. Graham*,

10

473 U.S. 159, 169 (1985). "State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State." *Hutto v. S. Car. Retirement Sys.*, 773 F.3d 536, 549 (4th Cir. 2014).

Accordingly, the Medical Defendants' motion to dismiss will be granted. The claims against them in their official capacities will be dismissed.

## B. Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 372 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). Additionally, the court may not "make credibility determinations or weigh the evidence." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007). Accordingly, summary judgment is inappropriate when there is conflicting evidence because it is

the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006).

As noted above, Burrell did not respond to the motion for summary judgment and did not come forward with any evidence to show a genuine dispute of fact.

**C. Section 1983 and Personal Involvement**

Plaintiff's claims against the Medical Defendants arise under 42 U.S.C. § 1983, which authorizes a civil action by a citizen deprived of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting under color of state law. To state a claim under § 1983, a plaintiff must allege both (1) the violation of a right secured by the Constitution and laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011). Moreover, to establish liability under § 1983, a plaintiff must demonstrate that each defendant had "personal involvement" in the alleged constitutional violation. *See Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (noting that liability under § 1983 is "personal, based upon each defendant's own constitutional violations"). Plaintiff must show "each government-official defendant, through the official's own individual actions, has violated the Constitution." *King v. Riley*, 76 F.4th 259, 269 (4th Cir. 2023).

**D. Eighth Amendment**

To establish a claim for deliberate indifference to a serious medical need in violation of the Eighth Amendment, a prisoner must show that (1) the deprivation was sufficiently serious and (2) the prison officials acted with a sufficiently culpable state of mind towards the prisoner's medical needs. *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022). To satisfy the second prong, the official must have had "actual knowledge of the risk to harm to the inmate" and

12

"recognized that his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." *Id.* A defendant acts with "deliberate indifference if he had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." *Gordon v. Schilling*, 937 F.3d 348, 357 (4th Cir. 2019). A defendant need not act with "actual purposive intent"; however, "mere negligence" is not enough. *Pfaller*, 55 F.4th at 445.

None of the Medical Defendants dispute that Burrell had a serious medical condition or conditions during the time that is framed by his allegations. However, each defendant disputes that he or she was deliberately indifferent to any of Burrell's medical needs.

### 1. Amber Hawks

Burrell's only allegation pertaining to Amber Hawks is that on January 12, 2024, she placed him on a sick call list for January 19, 2024. The medical records do not show a record dated January 19, 2024, and the records from January 12 do not show any involvement by Ms. Hawks. (Ex. A at 182.) Even if true, Burrell's allegation does not establish deliberate indifference to a serious medical need on behalf of Ms. Hawks.

Burrell has failed to respond to the motion for summary judgment with any admissible evidence. Accordingly, Hawks is entitled to summary judgment as there is no issue of fact that pertains to her personal involvement with any alleged violation of Burrell's constitutional rights.

### 2. Barbara Plaisance

Similar to the allegations against Amber Hawks, Burrell's only allegation against Ms. Plaisance is that she failed to examine him or check his vital signs after a syncopal episode on October 8, 2023. Once again, there is no medical record concerning this date in Burrell's medical records. Plaisance's name does not appear in the records at all. (*See* Ex. A.) Moreover,

13

Burrell's bare allegation is insufficient to create an issue of fact that Plaisance knew of an objectively serious medical need and disregarded it.

There being no relevant issues of fact, Plaisance is entitled to summary judgment.

### 3. Dr. Mathena

Plaintiff alleges that Dr. Mathena violated his constitutional rights by not referring Burrell for testing on January 24, 2024. On that date, Dr. Mathena performed a physical examination which was normal and did not merit referral. Burrell, moreover, was making nonsensical complaints, exhibiting paranoid and disorganized thinking, and as a result, Dr. Mathena referred plaintiff to mental health. A previous CT scan was normal. Finally, Dr. Mathena ordered blood work on February 5, just two weeks after the allegations raised in the complaint.

Burrell may have thought he required additional or different treatment from Dr. Mathena at various points during his incarceration at River North, particularly during his bouts of disorganized thinking. This is not relevant to the consideration of whether Dr. Mathena knew of and deliberately disregarded any serious medical needs. Instead, the record demonstrates that Dr. Mathena was responsive and attentive to all of Burrell's complaints, using medical judgment to address Burrell's concerns based on the situation. A disagreement about the medical care provided does not amount to deliberate indifference. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) ("Section 1983 was intended to protect only federal rights guaranteed by federal law, and not tort claims for which there are adequate remedies under state law."); *Hoskinson v. Boakya*, 1:21cv1320 (AJT/IDD), 2023 WL 3165185, at *4 (E.D. Va. Apr. 28, 2023) ("Disagreement by an inmate with a doctor's medical judgment or treatment decisions, however, generally does not constitute deliberate indifference.").

### 4. Amanda Taylor

Burrell's complaint against Ms. Taylor arises from her refusal to send him to an outside medical facility after being informed that he had fainted and fell down stairs. (Compl. 18.) This appears to refer to the episode occurring January 26, 2024, where Taylor was informed about the episode, but she was already aware of Burrell's history of chronic syncope. Taylor, as a nurse was not allowed to order referral to an outside medical facility. Moreover, Burrell had no injuries, his vital signs were stable, and he was not complaining of ongoing symptoms such as chest pain or shortness of breath. Thus, he could be monitored in MOU and not referred to a hospital. Moreover, she ensured that Dr. Mathena was notified so he could order any necessary interventions.

Once again, plaintiff's desire to be transferred to an outside medical facility does not evince or establish deliberate indifference. Burrell was seen by several medical providers, both within an outside of the prison facility. Taylor's actions towards Burrell after this fainting incident are not reflective of purposive intent to ignore Burrell's condition.

Accordingly, Nurse Taylor is entitled to summary judgment.

### 5. Anna Reavis

Burrell complains that Anna Reavis failed to order diagnostic testing after he fell down stairs following the January 26 syncopal episode. However, it was Molly Reavis, not Anna Reavis, that was involved in responding to this incident. There being no personal involvement in any alleged violation, Anna Reavis is entitled to summary judgment.

### 6. Molly Reavis

The claims against Molly Reavis are that she failed to provide medical assessments to Burrell on September 29, 2023, and January 26, 2024. The medical records show no entries

15

from September 29, 2023, for Burrell's medical treatment. The records do show that Molly Reavis assessed plaintiff following the January 26 syncopal episode. Accordingly, Ms. Reavis was either not personally involved or did not act with deliberate indifference.

The court will grant summary judgment to Molly Reavis.

### III.  CONCLUSION

Because there are no disputes of material fact and the Medical Defendants are entitled to judgment as a matter of law, the court will issue an appropriate order granting the motions to dismiss and for summary judgment filed by the Medical Defendants.

Entered:  September 29, 2025.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge